Estate of Pauline Miller, Deceased, George F. Miller, Executor v. Commissioner.
Estate of Miller v. Commissioner
Docket No. 6210-65.
United States Tax Court
T.C. Memo 1967-44; 1967 Tax Ct. Memo LEXIS 214; 26 T.C.M. (CCH) 229; T.C.M. (RIA) 67044; March 9, 1967
Carl G. Schluederberg, 1650 Union Commerce Bldg., Cleveland, Ohio, for the petitioner. Donald H. Richards, for the respondent. DAWSON
Memorandum Opinion DAWSON, Judge: Respondent determined an income tax deficiency against petitioner for the year 1963 in the amount of $428.23. The only issue presented for decision is whether the petitioner is entitled to a capital loss deduction under the provisions of section 165(c)(2), Internal Revenue Code of 1954, subject to the limitations of section 1211(b), resulting from the sale of Florida winter residence property held by her and her husband as tenants by the entirety where, after her husband's death, the petitioner made no personal use of the property, immediately offered it for sale, and later sold it at a loss. All of the facts have been stipulated by the parties and are hereby adopted as our findings. Pauline Miller, a widow and a resident of Cleveland, Ohio, filed her individual Federal income tax return for the taxable year 1963 with the district director of internal revenue at Cleveland. *216 She died on September 5, 1964, and George F. Miller was appointed executor of her estate by the Probate Court of Cuyahoga County, Ohio. On October 30, 1958, Pauline Miller's husband, Fred G. Miller, purchased property located at 191 East 29th Court, Riviera Beach, Florida. Such property was conveyed by deed to Fred G. Miller and Pauline Miller as tenants by the entirety and was used exclusively by them for winter vacation purposes. When Fred Miller died on July 30, 1959, Pauline became the sole owner of the property in accordance with the limitation contained in the deed which conveyed the property to them as tenants by the entirety. Neither Pauline nor any member of her family lived in or otherwise used the property after her husband's death, but the property was immediately listed for sale with a real estate broker at an asking price in excess of $20,000. She continuously offered the property for sale, changing brokers on three occasions in an effort to find a buyer, until February 1, 1963, when an offer was received and accepted by her. The net proceeds of sale, after expenses and commission, were $15,745. In her Federal income tax return for 1963, Pauline Miller claimed $4,255 *217 (the difference between her adjusted basis of $20,000, which was the value of the residence included in her husband's estate, and the net sale proceeds of $15,745) as a long-term capital loss on a transaction entered into for profit. Since there were no capital gains against which to offset the loss, Pauline used $1,000 of the claimed loss against her income from other sources. Respondent disallowed the claimed capital loss on the grounds that it was personal and nondeductible under section 262 and that the acquisition and sale of the property by Pauline was not a transaction entered into for profit within the meaning of section 165(c)(2). The law is clear that if the Florida property, which was used by the Millers for personal purposes, had been sold at a loss before Fred's death, the loss would not have been deductible because the mere offering of personally-held property for sale does not convert the subsequent sale into a "transaction entered into for profit" under section 165(c)(2). See Morgan v. Commissioner, 76 F. 2d 390 (C.A. 5, 1935); and William C. Horrmann, 17 T.C. 903 (1951). But here the property was not offered for sale or sold until after *218 Fred died, so that the crux of this case is whether or not Fred's death converted the loss incurred on the sale of the property into a deductible capital loss. Petitioner, in contending that a capital loss should be recognized under section 165(c)(2), [1] subject to the limitations of section 1211(b), [2] argues that: Mr. Miller's death in 1959 had the effect of freeing the property theretofore held as tenants by the entirety from his equal right of participation in possession, use and disposition. At the moment of her husband's death Mrs. Miller, the taxpayer, first acquired exclusive control of the property. At that moment the property acquired a neutral status for tax purposes just as if Mrs. Miller had inherited the property. Mrs. Miller never lived in or otherwise used the property subsequent to her husband's death. This fact coupled with her decision immediately subsequent to her husband's death to sell the property (which she was finally successful in doing though at a loss) converted the tax status of the property from that of a personal residence to that of a capital asset involved in a transaction entered into for profit. *219 Respondent contends that since Fred and Pauline owned the property as tenants by the entirety, Pauline acquired no additional interest or rights in the property because of Fred's death. This is because of the nature of a tenancy by the entirety. See Bailey v. Smith, 103 So. 833 (Sup. Ct. Fla., 1925). Consequently, it is argued that the property was held at all times by Pauline for personal living purposes. We agree with the petitioner. It seems well settled that if the winter residence property had been owned in fee by Fred Miller and devised to Pauline, or if it had passed to her from her husband by intestate succession, a loss would be allowed on its subsequent sale, there being no personal use by Pauline after Fred's death but a continuous effort to sell the property. See N. Stuart Campbell, 5 T.C. 272 (1945); Estate of Maria Assmann, 16 T.C. 632 (1951); and Mary E. Crawford, 16 T.C. 678 (1951). In each of these cases the tax status of the property became neutral at the moment of death and the use the devisee thereafter made of the property determined its future tax status. In substance, this case is no different from Crawford *220 or Assmann. In both of those cases the surviving spouse used and occupied the premises as a personal residence before the husband's death. Under Pennsylvania law where the Crawford property was located, and under New Jersey law where the Assmann property was located, each surviving spouse had a legal interest in the property (dower or intestate share) that required her to join in any conveyance that might be made by her husband. Surely personal use and a legal interest in the property during coverture make the Crawford and Assmann situations somewhat comparable, at least for Federal tax purposes, with the practical attributes of a tenancy by the entirety. See Tyler v. United States, 281 U.S. 497 (1930), a case involving tenants by the entirety, where Mr. Justice Sutherland, speaking for the Supreme Court, said (pp. 503-504): Taxation, as it many times has been said, is eminently practical, and a practical mind, considering results, would have some difficulty in accepting the conclusion that the death of one of the tenants in each of these cases did not have the effect of passing to the survivor substantial rights, in respect of the property, theretofore never enjoyed *221 by such survivor. Before the death of the husband (to take the Tyler case, No. 428) the wife had the right to possess and use the whole property, but so, also, had her husband; she could not dispose of the property except with her husband's concurrence; her rights were hedged about at all points by the equal rights of her husband. At his death, however, and because of it, she, for the first time, became entitled to exclusive possession, use and enjoyment; she ceased to hold the property subject to qualifications imposed by the law relating to tenancy by the entirety, and became entitled to hold and enjoy it absolutely as her own; and then, and then only, she acquired the power, not theretofore possessed, of disposing of the property by an exercise of her sole will. Thus the death of one of the parties to the tenancy became the "generating source" of important and definite accessions to the property rights of the other. We are not persuaded by respondent's argument that since there was a continuity of interest, the death of Pauline's husband did not afford her the point of departure, or moment of decision, in which she could elect a course of action that would affect the future tax *222 status of the property. This argument, based on the "unwitty diversities" of property law, not only overlooks practical considerations but also ignores the fact that Federal taxation does not depend upon "such shadowy and intricate distinctions of common law property concepts and ancient fictions." United States v. Jacobs, 306 U.S. 363, 369 (1939); Helvering v. Hallock, 309 U.S. 106, 112 (1939). At the moment of her husband's death Pauline Miller for the first time acquired sole control and was able to make her own decision about the future use of the property. See Lang v. Commissioner, 289 U.S. 109, 112-113 (1933), where the Supreme Court said that in a tenancy by the entirety "the death of the husband had the effect of freeing the estate from his equal right of participation in its possession, use and disposition, which, while he lived, stood in the way of the wife's exclusive enjoyment of those rights which ordinarily flow from ownership." She chose at that time to make no further personal use of the property and to sell it. Accordingly, we held that the petitioner incurred a capital loss in a transaction entered into for profit subject to *223 the limitations of section 1211(b). Decision will be entered for the petitioner. Footnotes
1. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * *
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and ↩
2. SEC. 1211. LIMITATION ON CAPITAL LOSSES. * * *
(b) Other Taxpayers. - In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. For purposes of this subsection, taxable income shall be computed without regard to gains or losses from sales or exchanges of capital assets and without regard to the deductions provided in section 151 (relating to personal exemptions) or any deduction in lieu thereof. If the taxpayer elects to pay the optional tax imposed by section 3, "taxable income" as used in this subsection shall be read as "adjusted gross income."↩